IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL DURANDO,<br>                Plaintiff, | CIVIL ACTION |
| v. | |
| THE TRUSTEES OF THE UNIVERSITY<br>OF PENNSYLVANIA AND MARCELO<br>KAZANIETZ,<br>                Defendants. | NO.  21-756 |

## MEMORANDUM OPINION

This case arises out of Plaintiff's time conducting cancer research as a Postdoctoral Fellow at the University of Pennsylvania.  Plaintiff maintains that he was constructively discharged in February 2020 for reporting his belief that his lab supervisor had discriminated against a colleague on the basis of her pregnancy and was misusing federal grant monies by forcing Plaintiff to spend too much time on activities that did not support his federally-funded research.

After his separation from the university, Plaintiff sued the Trustees of the University of Pennsylvania ("Penn") for breach of contract, and for retaliation under the Pennsylvania Whistleblower Law, 43 Pa. C.S. § 1421, *et seq*. ("PWL"), the False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951, *et seq*. ("PHRA").  To support his claims against Penn, Plaintiff engaged Dr. Lynn R. Hlatky to provide an expert opinion "regarding issues related to federal grants from the National Institutes of Health (NIH) and to the running of an academic cancer research lab."  Penn moved to exclude Hlatky's report and testimony pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579

1

(1993) and Federal Rule of Evidence 702.  For the reasons that follow, Penn's Motion will be granted in part.

## I. LEGAL STANDARD

Defendant's Motion is governed by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The *Daubert* standard is codified in Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  This rule "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit."  *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

## II. DISCUSSION

### A. Qualification

To satisfy *Daubert's* qualification requirement, an expert must possess "specialized knowledge regarding the area of testimony."  *Betterbox Comm'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327 (3d Cir. 2002) (quotation marks and citation omitted).  "The basis of this specialized knowledge can be practical experience as well as academic training and credentials."  *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quotation marks and citations omitted).  The qualification requirement is interpreted "liberally," *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008), and "a broad range of knowledge, skills, and training qualify an expert as such."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (citation omitted).  "[A]t a

minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman. . . ." *Waldorf*, 142 F.3d at 625 (alterations in original) (quoting *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987)).

Hlatky is an eminently qualified cancer researcher. She has been a Lecturer in the Department of Biophysics at the University of California, Berkeley; an Assistant Professor and Associate Professor at Harvard Medical School; and Director of the Center of Cancer Systems Biology at Tufts University School of Medicine in Boston. She is now the Director of a non-profit organization devoted to cancer research. In the past thirty years, she has served on over three dozen grant review panels, including at least fourteen NIH grant panels for cancer research. As a "principal investigator," she designed and directed no less than fifteen federal research grants, including through the NIH. She was also the sole principal investigator and director of three "Program Project" grants (one with the NIH, one with NASA, and one with the Department of Energy), each of which included an explicit training component.

Penn does not dispute these accolades. The thrust of its argument is that Hlatky's experience does not qualify her to opine on the T-32 *training* grant—the specific NIH grant that funded Plaintiff's fellowship—because her experience only covers *research* grants. Penn has not provided an explanation of the gulf that they contend sunders research grants from training grants, and Hlatky testified that they have more commonalities than differences "in terms of requirements and – and obligations and how the whole system works."[1] Furthermore, as noted above, Hlatky has been the principal investigator on grants with a training component. Her professional experience clearly exceeds the qualification requirement of *Daubert*.

---

[1] In her report, Hlatky refers to the T-32 grant as a "research training grant." Neither Party discussed the significance of this hybrid label.

### B. Reliability

To satisfy the reliability requirement, "the expert must have good grounds for his or her belief," and may not rely on "subjective belief or unsupported speculation." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 (quotation marks and citation omitted). The Supreme Court in *Daubert* set out a list of factors that courts may consider in assessing "whether a theory or technique is scientific knowledge": whether the theory can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error, the existence and maintenance of standards controlling the technique's operation, and its general acceptance within the community. *Daubert*, 509 U.S. at 593-94; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 n.8 (summarizing important reliability factors in this Circuit).

But *Daubert* was a case about scientific knowledge, and the factors it recommended for judicial consideration "are neither exhaustive nor applicable in every case." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 248 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806-07 (3d Cir. 1997)); *see also Kumho Tire Co, Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) ("[A] trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability."). "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony." *Kumho Tire Co.*, 526 U.S. at 150. The reliability test is flexible and a district court enjoys "broad latitude when it decides how to determine reliability." *Id*. at 142.

Here, the *Daubert* factors do not help in assessing the reliability of Hlatky's opinion on how federal grants and research labs operate because her opinion is not based on a scientific method. *Kumho Tire Co.*, 526 U.S. at 141. Instead, "the relevant reliability concerns [] focus

4

upon personal knowledge or experience." *Id*. at 150.

At her deposition, Hlatky testified that her report was based on "the summary of my knowledge, knowing and having looked at the requirements for the T32, knowing . . . my experience." For example, when asked how she "bec[a]me aware of the application requirements for an institutional T32 training grant," she referred to her thirty years of experience and explained, "it's just part of the culture. T32s are not unusual grants." She amplified that knowledge by researching the NIH website for "anything [she] could find" about T32 grants.

In light of Hlatky's experience with cancer research and grants, and the knowledge she has of NIH grant processes and procedures, her report generally meets the reliability threshold, with the exception of the following two passages:

> This change in career trajectory and opportunity appears to be the direct result of events and conduct Dr. Durando experienced at the University of Pennsylvania and, in particular, in the laboratory of Dr. Kazanietz; that constitute violations of NIH funding requirements.
>
> [. . .]
>
> Examining the documents in this case, it appears that the T32 funds awarded to support the full time (40 hours per week) cancer research training of Dr. Durando in Dr. Kazanietz's laboratory were diverted from their strict NIH-dictated purpose. This was driven, in my opinion, by clear and protracted pressure by Dr. Kazanietz upon the Trainee to engage in activities for the personal benefit of Dr. Kazanietz that were inimical to the core terms and restrictions of the T32 grant funding mechanism. In my view, these actions, as Dr. Durando reported them, lay well outside the bounds allowable under the T32 funding.

These statements cannot be considered reliable because they have no apparent connection to Hlatky's core expertise and she bases them entirely on her examination of unspecific "case documents." The "reliability analysis applies to all aspects of an expert's testimony," including

5

"the link between the facts and the conclusion." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). An expert's conclusions must "reliably flow from the facts known to the expert and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (citation omitted). The failure to adequately explain a conclusion can render an expert's testimony unreliable. *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 797 (3d Cir. 2017). Because Hlatky articulated no "good grounds" for these conclusions, *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742, they will be stricken from her report.

Regardless, whether these statements would be proper expert testimony for this witness is moot because Plaintiff conceded in his opposition brief that it "will be ultimately for the jury to determine" whether "the change in Plaintiff's career trajectory" is "the direct result of events and conduct Plaintiff experience at Penn" and whether "the T-32 funds awarded to support the full-time cancer research training of Plaintiff in Dr. Kazanietz's laboratory were diverted from their strict NIH-dictated purpose." Plaintiff acknowledged that Hlatky qualified her statements on these points with the phrase "it appears that," and admitted that she did not "set forth an expert opinion on either point." Indeed, her expert opinion is "limited to (1) how a post-doctoral fellow's career trajectory can be negatively impacted by leaving the academic research environment, and (2) the purpose, requirements, and obligations associated with receipt of training grant funds and the full-time research mandate associated with the same."[2] Thus, these statements will be stricken from Hlatky's report.[3]

---

[2] Penn also argues that Hlatky's report is not reliable because it "notes that Plaintiff spent 'significant time on activities not related to his research training'" without quantifying the amount of time spent. This argument fails because it mischaracterizes the report, which merely states, "[a]ny imposition requiring Dr. Durando to spend significant time on activities not related to his research training is explicitly forbidden by the T32 funding requirements." Plaintiff also conceded that Hlatky "was not retained to render an opinion on whether the time that Plaintiff spent on non-research activities was significant or not."

[3] Penn asserts that Hlatky's conclusion that "events and conduct" at Penn "constitute violations of NIH funding

6

With respect to the remainder of her report, Penn's arguments about reliability go to the weight of her proposed testimony, which is a matter for the jury. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (explaining that the Federal Rules of Evidence "place[] the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination"); *Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002) ("Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert, are within the sole province of the jury." (citing *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge."))).

### C. Fit

"In assessing whether an expert's proposed testimony fits, [the question is] whether the expert testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (quotation marks, ellipses, and citation omitted). "This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quotation marks and citations omitted). The standard for relevance under *Daubert* "is a liberal one." *Id.* at 587. "The Rules of Evidence embody a strong preference for admitting any evidence that *may* assist the trier of fact." *Pineda*, 520 F.3d at 243

---

requirements" does not fit the case because it constitutes improper legal opinion. In determining whether testimony will help the trier of fact, "the District Court must ensure that an expert does not testify as to the governing law of the case." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). "Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion." *Id.* (quoting *United States v. Leo*, 941 F.2d 181, 195-96 (3d Cir. 1991)) (expert could testify about the customs and business practices in the securities industry, but not about a party's legal duties arising from government agency pronouncements).

(emphasis added) (citation omitted).

Penn argues that Hlatky's report does not fit this case because her findings are "within the understanding of a jury without the aid of an expert."[4] Federal Rule of Evidence 702 is not so narrow. It permits the use of an expert "if his [or her] testimony will be helpful to the trier of fact in understanding evidence that is simply difficult, [though] not beyond ordinary understanding." *United States v. Downing*, 753 F.2d 1224, 1229 (3d Cir. 1985) (citation omitted). Expert testimony is not limited to information "beyond the jury's sphere of knowledge." *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 279 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)). "[D]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Id.* (alteration in original) (quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[03], at 702-14-15 (1982)).

Experts are not reserved for rocket science. Hlatky's testimony could be useful to the jury in understanding NIH grants and how research labs work, subjects which may be beyond the ken of a lay person.

An appropriate order follows.

                                                  **BY THE COURT:**

                                                  /s/Wendy Beetlestone, J.

                                                **WENDY BEETLESTONE, J.**

---

[4] Penn's other arguments as to fit concern the text stricken pursuant to the reliability analysis above and need not be addressed.