IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL DURANDO,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA AND MARCELO KAZANIETZ,** | **NO.  21-756** |
| **Defendants.** | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Michael Durando was a post-doctoral fellow at the University of Pennsylvania, where his research on cancer was supported by federal funding.  When his relationship with his supervisor, Defendant Marcelo Kazanietz, irreparably broke down and the university blocked his transfer to a different lab, Plaintiff resigned and turned to the courts for relief.  He asserts a claim against the Trustees of the University of Pennsylvania ("Penn") for breach of contract.  He also asserts claims against Penn for retaliation under four separate statutes: the Pennsylvania Whistleblower Law, 43 Pa. Stat. Ann. § 1421, *et seq.* ("PWL"); the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951, *et seq.* ("PHRA").  Penn moved for summary judgment on all of the claims against it pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, Penn's Motion will be granted in part and denied in part.

## I.    FACTUAL BACKGROUND

In July 2018, Plaintiff, a medical doctor and Ph.D., was appointed to Penn's biomedical post-doctoral program.  The appointment was for a one year period, but it was renewed a year

later and Plaintiff remained with Penn until he left in February 2020.  For most of his time at

Penn, he worked in the laboratory of Dr. Marcelo Kazanietz alongside five other post-doctoral

fellows, including Dr. Mariana Cooke, who was Kazanietz's wife.  Plaintiff's fellowship was

principally funded by a federal T-32 training grant (the "T-32 Grant") from the National

Institutes of Health ("NIH"), which aims to train and develop independent scientists in the area

of biomedical research pertaining to lymphocyte biology.  At all times during Plaintiff's

employment at Penn, the Principal Investigator of the T-32 Grant was Dr. Warren Pear.  As

Principal Investigator, Pear was responsible for, among other things, allocating the funding and

appointing trainers and trainees.

Plaintiff's concerns arose while he was working in Kazanietz's lab when he says he was

pressured by Kazanietz to help with Cooke's applications for medical residency programs, which

help eventually consumed his effort to the detriment of his academic work.

Frustrated and unhappy about the time he was spending on Cooke's applications,

sometime in late 2019, Plaintiff met with Mary Anne Timmins, the Administrative Director of

the Biomedical Postdoctoral Programs Office ("BPP").  He complained to her about the hours he

felt forced to spend on Cooke's medical school applications.  He also described to her a lab

meeting, which he surreptitiously recorded, at which he says Kazanietz "started screaming at

everyone, threatening everyone, that people were saying things about him that were not true and

that he would do something or go after people."  He began to look for opportunities to transfer

and settled on the lab of Dr. Youhai Chen.  Although Chen was amenable to having Plaintiff join

his team, any transfer required Pear's approval.

Following the meeting with Timmins, on December 24, 2019, Plaintiff emailed Kazanietz

in which he "express[ed] [his] unhappiness" about the "countless hours reviewing, discussing,

and planning" Cooke's residency applications, writing letters and emails on her behalf, and helping with her personal statements.  Although Kazanietz did not respond to this email, he shared it with, among others, Pear.  Someone, we do not know who, instructed Kazanietz not to communicate with Plaintiff.

A month later, Plaintiff met with Pear, who invited to the meeting Linda Nace, Director of Physical Operations in the Department of Pharmacology, and Dr. Richard Assoian, a professor at the School of Medicine.  Plaintiff told them that he felt pressured to help with Cooke's applications and that it was taking up a lot of his time.  He told them about the lab meeting he had recorded and expressed his desire to transfer to Chen's lab.

Plaintiff contends that, after this meeting, Kazanietz and Pear retaliated against him.  First, Pear denied his transfer request.  Then Kazanietz asked Plaintiff to hand over all of his research data and the two exchanged harsh words.  Plaintiff accused Kazanietz of creating a hostile work environment and Kazanietz responded that Plaintiff "should seriously consider switching labs immediately."

Matters came to a head on or around February 21, 2020, when Plaintiff withdrew the letters of recommendation he had written for Cooke from the online application portal, and replaced them with "an official letter" as a record of his "stance on her application" (*i.e.*, that he "no longer recommended her").  This action triggered an onslaught of offensive and threatening late-night communications from Kazanietz and Cooke.  On February 23, 2020, Plaintiff notified Pear of his immediate resignation.

## II.    LEGAL STANDARDS

To prevail at summary judgment, "the movant must show that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"

*Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir. 1992) (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The movant bears the initial burden of identifying those portions of the record "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Then, the non-moving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

"[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on summary judgment. *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

### A. Constructive Discharge

As a threshold matter, Penn argues that each of Plaintiff's claims must be dismissed because he has not shown that he suffered an adverse employment action.[1] Plaintiff maintains that he was constructively discharged, which amounts to an adverse employment action. As a

---

[1] Plaintiff's breach of contract claim is premised on his constructive termination prior to the end of his appointed term and an adverse employment action is an element of each of his four retaliation claims. *See O'Rourke v. Commonwealth*, 778 A.2d 1194, 1201 (Pa. 2001) (PWL); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001) (FCA); *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (Title VII and PHRA).

general rule an employee's resignation is "presumed to be voluntary." *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999). "This presumption remains intact until the employee presents evidence to establish that the resignation . . . was involuntarily procured." *Id*. Whether the presumption falls depends on the employee's ability to exercise free choice, as demonstrated by the surrounding circumstances. *Id*.

Whether an employee can recover on a claim of constructive discharge is viewed through an objective lens: "whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Colwell v. Rite Aid Corp*., 602 F.3d 495, 503 (3d Cir. 2010) (alterations in original) (citations omitted); *see also Green v. Brennan*, 578 U.S. 547, 555 (2016); *cf Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992) (claims of constructive discharge are not governed by the employee's subjective perceptions). To be compelled to resign is to have "no choice." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (quoting *Blistein v. St. John's Coll.*, 74 F.3d 1459, 1468 (4th Cir. 1996)).

"[T]he plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 316 n.4 (3d Cir. 2006) (quoting *Landgraf v. USI Film Prods*., 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244). The relevant factors are "whether the employer (1) threatened the employee with discharge or urged or suggested that she resign or retire, (2) demoted her, (3) reduced her pay or benefits, (4) involuntarily transferred her to a less desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job evaluations." *Colwell*, 602 F.3d at 503 (cleaned up) (quoting *Clowes v. Allegheny Valley Hosp*., 991 F.2d 1159, 1161 (3d Cir. 1993)). Considering these factors, and the circumstances surrounding

Plaintiff's resignation, there is a genuine dispute of material fact about whether Plaintiff was constructively discharged.

The retaliation alleged by Plaintiff begins after his January meeting with Pear, Nace, and Assoian—a meeting that Plaintiff had not known would be attended by Nace and Assoian, but who joined as "witnesses" at Pear's request. Plaintiff went straight to Timmins' office after the meeting. Upset, he told her that he had been accused of committing crimes during the meeting— apparently a reference to his secret recording of Kazanietz's lab meeting—and felt he needed an attorney. While they were speaking, Timmins received a phone call from BPP's Associate Dean, advising her that she was no longer permitted to speak to Plaintiff.[2] Two days later, his lab chair disappeared. A day later, his reagents went missing. A week after that, his lab refrigerator was emptied and his lab equipment was nowhere to be found.

Plaintiff asserts—and Penn disputes—that during this period, his interactions with Kazanietz and Cooke "turned cold, hostile, and threatening," and that they "began subjecting [him] to verbal abuse, threats, and patently false accusations." He testified that "it was both psychologically and physically impossible for me to continue working." When Pear denied the transfer to Chen's lab, Plaintiff concluded that "any possibility for [him] to transfer to a different lab and continue his research" had been "effectively ended."

Meanwhile, Pear sought from Kazanietz a letter about Plaintiff's performance. The letter, sent on February 3, 2020, "express[ed] major concerns": according to Kazanietz, Plaintiff's lab attendance was limited, his productivity poor, his work ethics meager, his interactions with colleagues "conflictive," and his behavior disruptive. After enumerating

---

[2] Penn denies this latter fact on the basis that it is privileged, but provides no facts from which privilege could be assessed. Yet even if it had done so, at most it would have shown that the communication was privileged, not that it did not occur.

specific examples of Plaintiff's "bizarre and unacceptable behaviors," Kazanietz wrote, "I have come to the conclusion that the only acceptable solution is to let him go to another lab."

One week later, Kazanietz emailed Nace and John Wherry, the department chair, to "update" them on Plaintiff.  He wrote that he had "not interacted at all with him" and that there was "no need to waste resources on his project at this stage."  Then Kazanietz gave Plaintiff mere hours to transfer all of his experimental records onto an external hard drive.  What followed was an email exchange on which Pear and other employees were copied, and in which Plaintiff accused Kazanietz of creating a hostile work environment and notified him that he would be consulting with counsel.  Kazanietz responded that Plaintiff "should seriously consider switching labs immediately" and stated that he was "not happy at all with both your academic and personal performance particularly in the last few months, your lack of collegiality, your bizarre behavior, your constant absenteeism, and the way you interact with lab members."

Ten days later, Plaintiff withdrew the letters of recommendation he had written in support of Cooke's medical residency applications.  His actions unleashed a firestorm of e-mails.  A sampling of Cooke's messages include: "You are a fucking weirdo useless lunatic scumbag"; "You want to play games with me mother fucker?"; "Show up mother fucker"; "You are a fraud, a freaking failure"; "You are not only an aberrant human being but also you are the most shiti [sic] physician ever"; "You totally messed up with the wrong person"; and, "Rot in hell Michael Durando."  Cooke warned Plaintiff that "*[i]f either you or any member of your crew ever dare to sabotage my medical residency application or interfere at any level with my professional career, I will not hesitate to press criminal charges. Furthermore, any single attempt to harm my physical/moral integrity as well as my personal property and/or assaulting or vandalizing my personal belongings will be severely punished at the maximum legal level*" (emphasis in

original).

Kazanietz's messages included: "On Monday, I will call U of A.  I am sorry for you. They will find out the truth about you"; "Think about it and act fast.  Remove those letters now before it is too late"; "You let me know no later than tomorrow noon, or I will proceed too"; "Mariana will tell your wife things that she does not want to hear. Believe when I tell you that it is not a good idea to play games with Mariana. Trust me on this one"; "you will have to pay the consequences for your stupid decisions"; and, "now that Mariana has nothing else to lose after you ruined her life, she will not be quiet anymore.  She will tell all the truth about you to whoever."

Plaintiff attached these communications to his email notifying Pear of his resignation, and explained that they "led [him] to this decision."  Plaintiff told Pear that the relationship between Kazanietz, Cooke, and himself had "deteriorated greatly" since he complained to BPP. Cooke's behavior, he said, had made him decide that he had an "ethical obligation to withdraw the Letters of Recommendation" and since then, the situation had so deteriorated that it was impossible for him to come to the lab.  He wrote that the "aggressive and threatening statements" made by Kazanietz and Cooke "caused me to fear for the safety of my family" and that "Penn's failure to take action against either of these individuals – Drs. Kazanietz and Cooke – leaves me no choice but to resign effective immediately."

These facts paint the picture of a rapidly deteriorating environment, beginning with Penn's denial of his transfer to Chen's lab—which Plaintiff interpreted as sending "a clear message . . . that he was no longer welcome at Penn and should resign."  In the wake of the denial, Kazanietz twice expressed his desire that Plaintiff switch labs.  Given that Chen's lab was no longer an option, these comments by Kazanietz are tantamount to a suggestion that Plaintiff

resign.  Kazanietz also criticized Plaintiff's performance multiple times, first in the letter to Pear, then in the email to Nace and Wherry, and finally to Plaintiff's face, in an email chain on which Pear and other employees were copied.  And these tensions culminated in the text messages sent by Cooke and Kazanietz to Plaintiff in the middle of the night on February 21 and 22—messages from Plaintiff's direct supervisor and his wife, containing expletives, insults, and threats.

On the basis of these facts, a reasonable juror could conclude that Plaintiff had "no choice" but to resign because his relationship with his lab supervisor had become intolerable, and though he had himself found a lab to transfer to, Penn had blocked the transfer—his way out of the situation he was in.[3]  Having addressed this threshold issue, each of Plaintiff's claims are considered seriatim below.

## B.  The Pennsylvania Whistleblower Law

Pennsylvania's Whistleblower Law bars employers from discriminating or retaliating against an employee who "makes a good faith report . . . to the employer or appropriate authority an instance of wrongdoing or waste[4] by a public body[5] . . . as defined in this act."  43 Pa. Stat. Ann. § 1423(a).  An employee who makes such a report is a "whistleblower" within the meaning of the statute.  43 Pa. Stat. Ann. § 1422; *Greco v. Myers Coach Lines, Inc.*, 199 A.3d 426, 430 (Pa. Super. 2018) (quoting *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300, 307 (Pa. 2015)).  To make

---

[3] Penn vaguely contends that Plaintiff could have secured "other funding sources" for his fellowship or pursued "potential avenues of recourse with the Facility Affairs Office."  As it does not explain what sources of funding were available, how Plaintiff could have obtained such funding, or what recourse the Facility Affairs Office could have provided, these conclusory assertions are insufficient to demonstrate the absence of a genuine dispute of material fact as to constructive discharge.

[4] Penn argues that Plaintiff made no report concerning "waste."  As Plaintiff does not respond to that argument, any claim based on a report of waste has been abandoned.  *Levy-Tatum v. Navient Sols., Inc.*, 183 F. Supp.3d 701, 712 (E.D. Pa. 2016) (plaintiff's failure to address some of defendant's arguments in reply brief resulted in abandonment of those claims).

[5] Penn does not dispute that it qualifies as a public employer under the PWL.

out a *prima facie* case under the PWL, Plaintiff must show that he "(1) reported an instance of wrongdoing . . . to an appropriate authority; and (2) there is a causal connection between the report and the alleged retaliation." *Frazier v. City of Phila.*, 441 F. Supp.3d 76, 97 (E.D. Pa. 2020) (citing 43 Pa Stat. Ann. § 1424(b)); *Johnson v. Res. for Hum. Dev., Inc.*, 789 F. Supp.2d 595, 601 (E.D. Pa. 2011) ("A plaintiff who asserts a Whistleblower cause of action must specify how their employer is guilty of . . . wrongdoing."). Penn challenges Plaintiff's *prima facie* case under the PWL on several grounds, each of which is discussed below.

### i.    A Report of "Wrongdoing"

"Wrongdoing" is defined in the statute as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 Pa. Stat. Ann. § 1422. Such law, regulation, or code of conduct must either create a duty to act or "specifically define some prohibited conduct." *See Sukenik v. Twp. of Elizabeth*, 131 A.3d 550, 552 (Pa. Commw. 2016) (citation omitted); *Riggio v. Burns*, 711 A.2d 497, 503 (Pa. Super. 1998) (*en banc*). "The report must provide information that is sufficient to identify the law allegedly violated; reports of vague or subjectively wrong conduct are not considered wrongdoing under the Whistleblower Law." *Sukenik*, 131 A.3d at 555-56.

Penn argues that Plaintiff has not made out a *prima facie* case under the PWL because he did not point to the violation of "a specific statute, regulation, ordinance, or code of conduct or ethics" and therefore made no report of "wrongdoing." Plaintiff contends to the contrary that he made a report of wrongdoing by complaining that "Dr. Kazanietz was forcing Plaintiff to spend his dedicated NIH-funded research time performing non-research related tasks, in violation of NIH funding requirements."

10

The record reflects a genuine dispute of material fact as to whether Plaintiff's internal complaints contained information "sufficient to identify the law allegedly violated." *Sukenik*, 131 A.3d at 555-56. Plaintiff testified that he reported through "the proper channels" certain behavior that he believed was illegal, and specifically "forcing an NIH funded train[ee] who's funded by the NIH . . . to do research . . . to do work on the NIH's dime that is not research, it has nothing to do with research."[6] He further testified that he told Timmins at the BPP about his involvement with Cooke's applications, because he was "frustrated and unhappy about the time I was losing what I was doing," which he believed was "wrong."

Other testimony in the record is consistent with Plaintiff's testimony to the extent it concerns his complaints about helping Cooke, but does not mention NIH funding requirements. For example, Timmins testified that Plaintiff came to her with concerns that "his project wasn't moving forward" because of "the amount of time he had to devote to writing letters and recommendations and things like that" for Cooke. While Pear testified that he had learned from another colleague that Plaintiff felt he was "being treated unfairly because he had to write some letters for the residency program that Dr. Kazanietz's wife was applying to," he also testified that Plaintiff never complained to him (Pear) that he felt there was a misuse of NIH grant funds. Both Assoian and Nace testified that Plaintiff had complained about feeling pressured to help Cooke, but neither mentioned NIH funding requirements.

Ultimately, the only record of what happened at these meetings comes from the testimony

---

[6] In his opposition brief, Plaintiff links this report to the "parameters and requirements that condition the receipt of federal funding in the form of a T-32 research training grant," relying on specific portions of the National Institutes of Health Grants Policy Statement. A gaping hole in this analysis is that the NIH Policy Statement in the record does not apply to the period of Plaintiff's employment, which ended in February 2020—every page states that "[t]his document applies to all NIH grants and cooperative agreements for budget periods beginning on or after *October 1, 2021*." But the standard is not whether Plaintiff identified the correct source of law in his papers before the Court, but whether his report to his employer was "sufficient to identify the law allegedly violated." *Sukenik*, 131 A.3d at 555-56. This hole in his case is therefore not enough to sink the ship.

of the people who attended them.  No one else was in the room where it happened.  It is for the

jury, not the Court, to determine the relative credibility of these witnesses, weigh their evidence,

and draw legitimate inferences therefrom.  *Anderson*, 477 U.S. at 255.  This genuine dispute of

material fact cannot be resolved at summary judgment.

### ii.    A "Good Faith" Report

Penn argues that any report of wrongdoing made by Plaintiff was not in "good faith"

because his "primary concern" at the time was "(1) the ability to spend time with his family;

(2) to conduct research on a schedule that worked for [him]; and (3) to conduct research that

solely benefitted [his] own research."  A "good faith" report under the PWL is one made

"without malice or consideration of personal benefit and which the person making the report has

reasonable cause to believe is true."  *Sukenik*, 131 A.3d at 555 (quoting 43 Pa. Stat. Ann.

§ 1422).

To support their opposing positions on this question, the Parties cherry-pick excerpts

from Plaintiff's deposition testimony and from his December 2019 email to Kazanietz, each

asserting that their snippets distill Plaintiff's true motivations.  Whether Plaintiff complained

about spending time on Cooke's application with or without consideration of benefits personal to

himself is a genuine dispute of material fact.  At trial, each side may tell its side of the story to

the jury, which will weigh the evidence and draw its own conclusions.[7]

---

[7] The cases relied on by Penn are distinguishable.  In *Frazier v. City of Phila.*, 441 F. Supp.3d 76 (E.D. Pa. 2020), a plaintiff's PWL claim was dismissed because her "primary goal" in filing a report was "resolving her own personal issue"—her entitlement to overtime pay.  *Id.* at 93.  Here, there is no allegation that Plaintiff was not receiving his due; the purported problem is not that his funding was withheld, but that he was not permitted to spend his time in fulfilling the NIH's funding conditions, including full-time research.  In *Albright v. City of Phila.*, 399 F. Supp.2d 575 (E.D. Pa. 2005), the plaintiff's PWL claim was dismissed because her report, which concerned allegedly discriminatory treatment, had been made with "consideration of personal benefit" within the meaning of the PWL. *Id.* at 596.  Plaintiff here does not allege that the conduct that triggered his report was discriminatory.

### iii.    Retaliation *"as a Result of"* a Report

Penn's final challenge to Plaintiff's *prima facie* case on the PWL claim is that he has not

shown that his alleged constructive discharge occurred "as a result of" a report of "wrongdoing."

"To make out a prima facie case of retaliatory termination pursuant to the Whistleblower Law, a

plaintiff must show by concrete facts or surrounding circumstances that the report of wrongdoing

. . . led to the plaintiff's dismissal." *Golaschevsky v. Dep't of Env't Prot.*, 720 A.2d 757, 759

(1998) (cleaned up) (quoting *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. 1994)).  Neither

"vague and inconclusive circumstantial evidence" nor a plaintiff's own "perception of how

others treated him" will suffice.  *Id*. at 759-60 (evidence that plaintiff received a negative

performance evaluation three weeks after reporting wrongdoing, that his supervisor got angry

with him when he made the report, that he felt he was treated differently thereafter, and of his

discharge four months later did not suffice to show a causal connection).

Here, Plaintiff has advanced evidence sufficient to create a genuine dispute of material

fact as to causation.  He notes that Pear denied the transfer request one day after meeting with

him,[8] and that in the ensuing month, he suffered a pattern of antagonistic conduct—including the

missing lab equipment, Timmins' sudden silence, the "cold, hostile, and threatening" treatment

from Kazanietz and Cooke, and Kazanietz's criticism of his performance, suggestions that

Plaintiff transfer to another lab, and demand that Plaintiff transfer all of his research data

immediately—all culminating in the late-night name-calling and threats on the eve of his

resignation.  "[V]iew[ing] the facts and draw[ing] reasonable inferences 'in the light most

favorable'" to Plaintiff, *Scott*, 550 U.S. at 378, a reasonable jury could weigh this evidence and

---

[8] Plaintiff's meeting with Pear took place on January 28, 2020.  Plaintiff met with Timmins approximately five
times, including on December 18, 2019; January 23, 2020, January 27, 2020, and January 28, 2020.

conclude that a causal connection exists between Plaintiff's reports of wrongdoing to Timmins and Pear, and his alleged constructive discharge.

As Plaintiff has identified a genuine dispute of material fact as to each element of his *prima facie* case, summary judgment will not be granted on the PWL claim.

### C.  The False Claims Act

Plaintiff also brings a claim of retaliation under the FCA, which "prohibits fraudulent claims that cause or would cause economic loss to the government." *Hutchins*, 253 F.3d at 179; *see also* 31 U.S.C. § 3729.  The Act's whistleblower provision, 31 U.S.C. § 3730(h), "protects employees who assist the government in the investigation and prosecution of violations of the False Claims Act." *Hutchins*, 253 F.3d at 185-86.  "A plaintiff asserting a cause of action under § 3730(h) must show (1) he engaged in 'protected conduct,' . . . and (2) that he was discriminated against because of his protected conduct.'" *Id*. at 186 (citing *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)).  Penn challenges Plaintiff's claim under both prongs.

Protected conduct consists of "lawful acts done . . . in furtherance of an action" under the FCA or "other efforts to stop 1 or more violations" of the Act.  31 U.S.C. § 3730(h)(1).  The first prong applies to conduct furthering "an action filed or to be filed" under the FCA, including "investigation for, initiating of, testimony for, or assistance in," an FCA lawsuit.  *Hutchins*, 253 F.3d at 187.  There must be at least a "distinct possibility that a viable FCA action could be filed." *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 108 (3d Cir. 2002).  By contrast, the second prong is "not tied to the prospect of a False Claims Act proceeding." *Id*. at 295-96.  Protected activity exists under the second prong if the plaintiff shows that he or she "took lawful measures to stop or avert what [he or] she reasonably believed would be a violation of the False

Claims Act." *Singletary v. Howard Univ.*, 939 F.3d 287, 297 (D.C. Cir. 2019).[9]

To show that he suffered discrimination "because of" protected conduct under the FCA, a plaintiff must show that, but for his or her protected conduct, the discrimination would not have occurred. *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 76 (3d Cir. 2018).  In addition, the plaintiff must show that the employer had knowledge that he or she was engaging in protected conduct within the meaning of the FCA. *Hutchins*, 253 F.3d at 186.[10]

Plaintiff rests his FCA causation analysis on the same evidence that he presented to support causation for his PWL claim.  But the evidence of temporal proximity and antagonism proffered for the PWL claim—for example, Pear's denial of the transfer the day after his meeting with Plaintiff, and the "cold, hostile, and threatening" interactions with Kazanietz and Cooke— does not speak to the definition of "protected conduct" under the FCA, and therefore does not show that Penn knew that he was engaging in protected conduct within the meaning of the Act. Nor does the fact that Penn knew that Plaintiff had complained suffice to meet this element. Plaintiff must also show that Penn knew "that [plaintiff's] activity amounted to protected activity." *Weihua Huang v. Rector & Visitors of the Univ. of Va.*, 896 F. Supp.2d 524, 551 (W.D. Va. 2012).

An employer's knowledge of protected conduct is a "fact specific inquiry." *Hutchins*, 253 F.3d at 187.  It requires distinguishing "[m]ere[] grumbling to the employer about job dissatisfaction or regulatory violations," *U.S. ex rel. Yesudian*, 153 F.3d at 743, from complaints

---

[9] The Third Circuit has not yet interpreted this second prong, which was added to the FCA by Congress in 2009. *See Crosbie v. Highmark, Inc.*, 2019 WL 6530990, at *6 n.9 (E.D. Pa. Dec. 4, 2019); Fraud Enforcement & Recovery Act of 2009, 111th Cong. § 4 (2009).

[10] This knowledge requirement "ensures that § 3730(h) suits are only prosecuted where there has been actual retaliation." *Hutchins*, 253 F.3d at 186 n.7; *see also Singletary*, 939 F.3d at 301 ("Common sense teaches that an employer cannot retaliate against conduct of which it was unaware.").

sufficient to put the employer on notice that the plaintiff "was engaging in lawful acts aimed at preventing the [] submission of false or fraudulent claims." *Singletary*, 939 F.3d at 300. Plaintiff makes no effort to explain how the "nature" of his complaints rendered them protected conduct within the meaning of the FCA. Because he has not pointed to any evidence that Penn had knowledge that he engaged in protected conduct within the meaning of the FCA, summary judgment must be granted on Plaintiff's FCA claim.

### D. Title VII and the PHRA

Plaintiff's Title VII and PHRA claims are based on a set of facts distinct from those discussed so far. They concern a complaint of pregnancy-based discrimination that he made on behalf of his lab colleague, Dr. Victoria Casado Medrano. Medrano informed Kazanietz that she was pregnant in November 2019. A few days later, Kazanietz told Medrano that he had "realized that he didn't have money to cover [her] full year" and that her contract would finish in May instead of August. Medrano testified that she told Plaintiff about the situation and he recommended she speak with BPP, which she did. At the time, Medrano's thinking was that her contract was being ended early because of her pregnancy.[11] Plaintiff reported to BPP his suspicion that Kazanietz had discriminated against Medrano on the basis of her pregnancy. The Complaint alleges that Penn retaliated against Plaintiff for making this report.

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) [he] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action.'" *Moore*, 461 F.3d at

---

[11] Medrano's appointment letter reflects that her funding had always been scheduled to end in May 2020, and Timmins testified that Penn offered to help her find another position, and that Medrano admitted she had known from the beginning that she would not have a full year of funding.

340-41 (quoting *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir. 1995)).[12]

"Protected activity" includes opposition to unlawful discrimination, so long as "the employee [] hold[s] an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Id*. at 341. "'Opposition' to discrimination can take the form of 'informal protests of discriminatory employment practices, including making complaints to management.'" *Id*. at 343 (quoting *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc*., 450 F.3d 130, 135 (3d Cir. 2006)). "Adverse employment action" means retaliatory actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 341 (quoting *Burlington N. & Santa Fe R.R. Co. v. White*, 126 S.Ct. 2405, 2415 (2006)).

As Plaintiff's case rests on indirect evidence, the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017). That framework requires Plaintiff to make out a *prima facie* case of discrimination. *Moore*, 461 F.3d at 342. Then, "the burden shifts to the employer to provide a legitimate, non-retaliatory reason for its conduct." *Id.* (internal quotation marks omitted). In the third and final step, Plaintiff "must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (quoting *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500-01 (3d Cir. 1997)). While the burden of production shifts between the parties, the burden of persuasion remains always with the plaintiff. *Carvalho-Grevious*, 851 F.3d at 257.

Penn does not dispute that Plaintiff engaged in protected activity when he reported to

---

[12] Discrimination claims under Title VII and the PHRA are interpreted co-extensively. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

Timmins that he believed Kazanietz had discriminated against Medrano on the basis of her pregnancy.  It argues that Plaintiff was not constructively discharged, but as noted above, there is a genuine dispute of material fact as to that allegation.  It also challenges Plaintiff's *prima facie* case on the grounds that Plaintiff has not established a causal connection between that report and any retaliatory acts.

At the *prima facie* stage, a plaintiff can establish causation by showing "that her engagement in a protected activity was the likely reason for the adverse employment action." *Carvalho-Grevious*, 851 F.3d at 253.  A "broad array" of evidence may establish causation, including temporal proximity, "any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action."  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015).

As with his PWL claim, Plaintiff's *prima facie* case under Title VII and the PHRA is based on temporal proximity and an alleged pattern of antagonism.  Specifically, that Penn denied his transfer to Chen's lab the day after the meeting with Pear, and that in the following month his interactions with the Defendants included the "cold, hostile, and threatening interactions" he had with Kazanietz, and Cooke; the missing lab equipment; Kazanietz's February 3rd letter to Pear complaining about Plaintiff; his letter stating that there was "no need to waste resources" on Plaintiff's research; his demand that Plaintiff transfer all of his research data immediately; his suggestion that Plaintiff "switch labs immediately"; and the angry middle-of-the-night texts from Kazanietz and Cooke.

Penn argues that Plaintiff has not established a causal connection based on these facts because there is no evidence that Kazanietz was aware that Plaintiff had complained on

Medrano's behalf.  But Plaintiff did tender evidence that Kazanietz knew.  The record contains a February 23 email from Kazanietz to Wherry and another colleague, stating that he had "found out" the "actual issues" with Plaintiff about three weeks prior, and that "[t]his . . . involved another post-doc who unfairly accused me of firing her due to her pregnancy."  Though a slim thread, this email connects Kazanietz's issues with Plaintiff to the report of pregnancy discrimination against Medrano.  This is sufficient to create a genuine dispute of material fact about Kazanietz's knowledge of Plaintiff's report prior to the retaliatory conduct alleged by Plaintiff, which is enough for Plaintiff's *prima facie* case.  *See Burton*, 707 F.3d at 426.[13]

At the second step of the *McDonnell Douglas* framework, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct."  *Carvalho-Grevious*, 851 F.3d at 257.  While Penn offers a legitimate reason for its denial of the transfer to Chen's lab—that the T-32 Grant "could not support the salaries of two post-doctoral fellows in the same laboratory with the same research focus—Plaintiff sufficiently rebutted this reason by pointing to record evidence of three different explanations for the denial:  that it would "look bad for the T32"; that there was already a T32 grantee in Chen's lab; and that he had committed a crime.  This constitutes an "inconsistency" sufficient that "a reasonable factfinder could rationally find" Penn's proffered legitimate reason for its action "unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons."  *Daniels*, 776 F.3d at 199 (alteration in original).   Accordingly, Penn has not carried its burden of production and its Motion will be denied as to Plaintiff's Title VII and PHRA claims.

---

[13] Furthermore, Plaintiff emphasizes that his *prima facie* case is not based on the actions of Kazanietz alone, but on the actions of Penn, which denied his transfer to Chen's lab, did not help him transfer to any other lab, and instructed Kazanietz not to communicate with Plaintiff.

### E.  Breach of Contract

Plaintiff's final claim is one for breach of contract.  Under Pennsylvania law, a claim for breach of contract has three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages."  *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

Plaintiff argues that the March 20, 2018 letter offering him the position of Postdoctoral Researcher (the "2018 Appointment Letter") and the August 9, 2019 letter offering him the position of Postdoctoral Fellow (the "2019 Appointment Letter") are employment contracts.[14] Here, the appointment letters offered employment, were accepted by Plaintiff, and consideration was provided in the form of compensation for services.  Thus, they formed an employment contract.  *See Muhammad v. Strassburger, McKenna, Messer, Shilobod and Gutnick*, 587 A.2d 1346, 1349 (Pa. 1991).

Plaintiff's first theory of breach is that the 2018 Appointment Letter, by stating that renewal of the appointment was based in part on the Policy for Postdoctoral Fellows, incorporated that Policy into its terms; and that Penn breached many of the Policy's provisions by failing to provide "the research training, laboratory experience, and career mentoring" promised.[15] As Penn did not respond to Plaintiff's contention that the Policy for Postdoctoral

---

[14] Penn does not address this argument head-on, instead focusing on whether or not Plaintiff was an at-will employee.  This tactic misses the mark.  "Every employment relationship is also a contractual relationship. Even at-will employment is formed by contract. The type of employment (the duration and the permissible grounds for discharge) is determined by the type of contract entered into."  *Darlington v. Gen. Elec.*, 504 A.2d 306, 309 (Pa. Super. 1986).  Therefore, to inquire whether or not Plaintiff's employment was at-will puts the cart before the horse.

[15] Plaintiff cites only to the 2018 Appointment Letter for this theory, perhaps because the 2019 Appointment Letter does not mention the Policy for Postdoctoral Fellows.  The Parties have not addressed whether the 2018 Appointment Letter alone can form the basis for a breach of contract claim based on this theory, even though it appears from the record that most of the events that allegedly disrupted Plaintiff's research occurred after the term

Fellows was incorporated into his employment contract, this argument is waived. *Levy-Tatum*, 183 F. Supp.3d at 712. Plaintiff's breach of contract claim based on violations of the Policy for Postdoctoral Fellows will not be dismissed.

Second, Plaintiff asserts that, by "setting forth the specific NIH grants that funded [his] stipend," the appointment letters incorporated "the requirements and obligations associated with Penn's receipt of the federal NIH grants" into his employment contract and agreed to abide by them. These requirements and obligations were allegedly breached in the same manner as the Policy for Postdoctoral Fellows. But Plaintiff does not cite to any NIH requirements in support of this theory; he relies entirely on language from an application for grant funding prepared by Penn. This document is not a contract between Penn and Plaintiff. Because Plaintiff has not linked his breach of contract claim to a specific contractual promise, Penn's Motion must be granted, and his breach of contract claim based on violations of NIH grant requirements will be dismissed. *See Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999).

Plaintiff also asserts that his constructive discharge was a breach of his employment contract. This theory is, however, unsustainable because Pennsylvania courts do not recognize an action for breach of contract on the basis of discriminatory termination. *See Bruffett v. Warner Commc'ns, Inc.*, 692 F.2d 910, 918 (3d Cir. 1982) (citing *Bonham v. Dresser Indus., Inc.,* 569 F.2d 187 (3d Cir. 1977), *cert. denied,* 439 U.S. 821 (1978)). To recognize such a cause of action would "give the claimant an opportunity to circumvent the carefully drafted legislative procedures" of the PHRA. *Id*.; *see also Murray v. Com. Union Ins. Co. (Com.*), 782 F.2d 432, 436-37 (3d Cir. 1986) (Pennsylvania courts will not recognize a common law action for claims that are cognizable under the PHRA). Plaintiff's allegation that his resignation amounted to

---

covered by the 2018 Appointment Letter had ended.

constructive discharge is based solely on Penn's allegedly retaliatory conduct.  Therefore, his

common law action for breach of contract based on wrongful discharge is barred by the PHRA.[16]

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**

---

[16] Penn also asserted that the FCA and Title VII preempt Plaintiff's contract claim for the same reason, but it only mentioned this argument in passing, it will not be examined here.  *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing . . . but not squarely argued, are considered waived.").